**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ABRAHAM BARKHORDAR, SARAH ZELASKY, and ELLA WECHSLER-MATTHAEI, individually and on behalf of all others similarly situated, | No. 1:20-cv-10968-IT |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| Defendant. | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION .................................................................................................. 1

II.    JURISDICTION AND VENUE ................................................................................... 3

III.    PARTIES ....................................................................................................................... 4

IV.    FACTS ........................................................................................................................ 11

    A.    Harvard encourages prospective students to enroll and sets its tuition and fees based on providing students in-person classes and in-person access to professors, students, and the full array of campus resources. ......................................................... 11

    B.    Following enrollment at the start of their degree-granting program, the parties' conduct makes clear in-person instruction was a material consideration. .................. 18

    C.    Plaintiffs and Class Members enrolled at Harvard and paid tuition and fees for the Spring 2020 Term with the expectation of in-person learning. .............................. 27

    D.    Harvard ends in-person classes and moves to online instruction without issuing a tuition refund. ....................................................................................................... 29

    E.    Harvard maintains virtual instruction for the Fall 2020 Term without any reduction in tuition or fees. ..................................................................................................... 32

    F.    Harvard maintains virtual instruction for the Spring 2021 Term without any reduction in tuition or fees. .......................................................................................... 35

    G.    Harvard's refusal to refund and/or reduce its tuition harms Plaintiffs and Class Members. ...................................................................................................................... 39

    H.    Economic Damages .................................................................................................... 41

V.    CLASS ACTION ALLEGATIONS .......................................................................... 42

VI.    CAUSES OF ACTION .............................................................................................. 45

COUNT I  BREACH OF CONTRACT—Spring 2020 Term .................................................. 45

PRAYER FOR RELIEF ........................................................................................................... 47

JURY DEMAND ...................................................................................................................... 47

Plaintiffs, ABRAHAM BARKHORDAR, SARAH ZELASKY, and ELLA WECHSLER-MATTHAEI, individually and on behalf of all others similarly situated, for this Second Amended Consolidated Class Action Complaint against Defendant President and Fellows of Harvard College ("Harvard"), based upon personal knowledge as to their own actions and based upon the investigation of counsel regarding all other matters, complain as follows:

## I.  NATURE OF ACTION

1.  This Second Amended Consolidated Class Action Complaint comes during a time of hardship for so many Americans, with each day bringing different news regarding the novel coronavirus COVID-19. Social distancing, shelter-in-place orders, and efforts to 'flatten the curve' prompted colleges and universities across the country to shut down their campuses, evict students from campus residence halls, and immediately switch to online "distance" learning.

2.  On March 10, 2020, Harvard announced that beginning March 23, 2020 (the first day back from Spring Recess), it would transition all classes (undergraduate, graduate, and professional) to virtual instruction until further notice. In accordance with this policy, Harvard did not hold any in-person classes since March 13, 2020. Instead, all classes for the remainder of the Spring Term were hastily switched to an online format with no in-person instruction.

3.  Despite sending students home, switching to online instruction, and closing its campuses, Harvard continued to charge full tuition and fees for the Spring 2020 Term as if nothing changed, continuing to reap the financial benefit of millions of dollars from students. Harvard did so despite students' complete inability to continue school as normal, occupy campus buildings and dormitories, or avail themselves of school programs, services, and events Harvard touted as a benefit of enrolling in and attending Harvard's degree granting programs. So while students enrolled and paid Defendant for an on-campus academic experience, Defendant instead offered Plaintiffs and Class Members an online experience presented by Google or Zoom, void of face-to-face faculty

and peer interaction, separated from program resources, and barred from facilities vital to an on-campus educational experience. This is not what Plaintiffs and Class Members bargained for when they matriculated.

4.     Harvard Law School, at least, acknowledged that this mid-Term switch to online instruction was not what students had bargained for when matriculating, and would create significant challenges for students who had bargained for in-person classes. In an email to students on March 16, 2020, Catherine Claypoole—Associate Dean/Dean of Academic and Faculty Affairs—and Lisa Burns—Assistant Dean/Registrar—stated: "We understand that an online teaching format may change for some classes the mode and extent possible of class participation, and that asynchronous learners may not be able to engage in participation during regularly scheduled class sessions." Harvard Law School then announced on March 20, 2020 that it would do away with its regular grading system for the Spring 2020 Term and mandate that all law students receive Credit/Fail grades instead.

5.     And while some colleges and universities have promised appropriate and/or proportional refunds, Harvard excludes itself from such other institutions treating students fairly, equitably, and as required by the law. Harvard has refused to provide any tuition refunds.

6.     In late May and early June of 2020, Harvard Medical School, Harvard Law School, Harvard Kennedy School, and the Harvard Graduate School of Education announced that the Fall 2020 Term would occur solely in an online format. In July 2020, Harvard's undergraduate College also announced all Fall 2020 Term courses will take place fully online. Harvard Business School announced a mix of fully online and hybrid in-person and online courses for the Fall 2020 Term.

7.     While some schools (*e.g.*, Law) offered current and incoming students a deferral option, others (*e.g.*, Education) did not. Furthermore, the tuition for each Harvard school for the Academic Year 2020–2021 will remain flat at the 2019–2020 level. Thus, Harvard declined to offer

any sort of tuition reduction in light of the fact that a full one-half (and later, for some schools, the entirety) of the 2020 Academic Year would occur solely in an online format. The Harvard Law School administration has even gone so far as to tell concerned students to take out an additional loan and "rent office space" if they have trouble studying off-campus.[1]

8.      Essentially, students paid Harvard tuition and fees for the promised on-campus instruction that was not available to them, access to buildings they could not enter, technology, programs and services that Harvard suspended, and activities that were not available. Harvard thus profited from COVID-19 while further burdening students and their families—many of whom have been laid off, become ill, lost loved ones, or are otherwise already bearing the brunt of the COVID-19 pandemic. The result is an enormous windfall to Harvard. Both contract and equity demand that Harvard disgorge its ill-gotten funds.

9.      Defendant's actions have financially damaged Plaintiffs and Class Members. Plaintiffs bring this action because Plaintiffs and the Class defined below have lost the benefit of the education and services they were promised when they matriculated without a corresponding reduction in tuition and fees.

10.      Plaintiffs therefore seek, individually and on behalf of the Class, a proportionate reimbursement of tuition and fees for the Spring 2020 Term and a similar reimbursement for any subsequent academic term conducted in an online format and for which Harvard charges tuition and fees at the same level or higher as prior years.

## II.      JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject matter presented by this consolidated complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"),

---

[1] https://abovethelaw.com/2020/06/harvard-law-tells-concerned-students-to-rent-office-space-to-study-during-online-only-semester./.

Pub. L. No. 109-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual Class Members in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §§ 1332(d)(2) and (6). Diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A). Plaintiffs allege that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Massachusetts, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).[2]

12.     This Court has personal jurisdiction over Defendant because it is headquartered in this District and many of the acts and transactions giving rise to this action occurred in this District.

13.     Venue is appropriate in this District because Defendant is located within the District of Massachusetts. And on information and belief, events and transactions causing the claims herein, including Defendant's decision-making regarding its refund policy challenged in this lawsuit, has occurred within this judicial district.

### III.     PARTIES

**A.  Plaintiff Abraham Barkhordar**

14.     Plaintiff Abraham Barkhordar ("Plaintiff Barkhordar") is a citizen and resident of the State of California. Plaintiff enrolled as a full-time graduate student at Harvard Law School in the Fall of 2019. Plaintiff Barkhordar was a full-time Juris Doctor candidate in good standing attending Harvard Law School during the Spring 2020 Term.

---

[2] About 17.1% of the students attending Harvard University come from within Massachusetts. https://www.collegefactual.com/colleges/harvard-university/student-life/diversity/#chart-geographic-diversity.

15.     Plaintiff Barkhordar paid Defendant for opportunities and services that he did not receive, including on-campus education, facilities, services, and activities.

16.     Plaintiff Barkhordar enrolled at Harvard to obtain the full experience of live, in-person courses and direct interactions with instructors and students. While other schools offer online programs for obtaining a J.D., Plaintiff Barkhordar purposefully did not apply to those programs and instead specifically selected an on-campus experience for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide.

17.     Prior to beginning the Spring 2020 Term, and prior to paying tuition and fees, Plaintiff Barkhordar consulted Harvard's my.harvard.edu course portal and enrolled in courses for the Spring 2020 Term. In consulting the my.harvard.edu course portal, Plaintiff Barkhordar understood and believed that every course in which he enrolled was to be taught in-person. Plaintiff Barkhordar was subsequently provided with course syllabi noting the date, time, and on-campus location where the courses would be taught. Indeed, Plaintiff Barkhordar's Spring 2020 Term schedule showed that each and every class in which he enrolled was to be taught in-person by listing a specific building and room number in which the courses would be held.

18.     Thus, the in-person nature of the courses was part of the benefit of the bargain, and Plaintiff Barkhordar would not have enrolled at Harvard Law School and/or paid as much, if any, tuition and fees for the Spring 2020 Term, Fall 2020 Term, or Spring 2021 Term at Harvard had he known that the courses would switch to online instruction half-way through the Spring 2020 Term.

19.     Plaintiff Barkhordar thus enrolled at Harvard Law School because of the in-person experience, and contracted for and paid Defendant for on-campus instruction, opportunities, facilities, and services for the entirety of his law school education, and especially the Spring 2020 Term.

20.     The tuition and fees for which Harvard charged Plaintiff Barkhordar were predicated on access to and constant interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology and libraries; opportunities to attend or participate in spectator sports and athletic programs; access to student government and health services; and participation in extracurricular groups and learning, among other things.

21.     Plaintiff Barkhordar was specifically deprived of the libraries, computer lab, printing services, mailroom, study spaces in the law school and on campus, clinical and work opportunities, in-person study groups, school mentorship activities, social events, and interprofessional school networking events, his in-person health care, loss of access to the Harvard gym facilities (where he used to play basketball, swim, and lift weights most days), intramural sports, recreational sailing, and bicycle storage, and his ability to live in on-campus housing (at the time, Plaintiff Barkhordar was living at Story Hall).

**B.  Plaintiff Sarah Zelasky**

22.     Plaintiff Sarah Zelasky ("Plaintiff Zelasky") is a citizen and resident of the State of North Carolina. Plaintiff Zelasky graduated from Harvard in the Spring of 2020 with a Master's Degree in Public Health. Plaintiff Zelasky was enrolled as a full-time graduate student in good standing at Harvard's T.H. Chan School of Public Health during the 2020 Spring Term.

23.     Plaintiff Zelasky paid Defendant for opportunities and services that she did not receive, including on-campus education, facilities, services, and activities.

24.     Plaintiff Zelasky enrolled at Harvard to obtain the full experience of live, in-person courses and direct interactions with instructors and students. While Harvard offers some online programs, Plaintiff Zelasky purposefully did not apply to those programs and instead specifically selected an on-campus experience for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide.

25.     Prior to beginning the Spring 2020 Term, and prior to paying tuition and fees, Plaintiff Zelasky consulted Harvard's my.harvard.edu course portal and enrolled in courses for the Spring 2020 Term. In consulting the my.harvard.edu course portal, Plaintiff Zelasky understood and believed that every course in which she enrolled was to be taught in-person. Plaintiff Zelasky was subsequently provided with course syllabi noting the date, time, and on-campus location where the courses would be taught. Indeed, Plaintiff Zelasky's Spring 2020 Term schedule showed that each and every class in which she enrolled was to be taught in-person by listing a specific building and room number in which the courses would be held.

26.     Thus, the in-person nature of the courses was part of the benefit of the bargain, and Plaintiff Zelasky would not have enrolled at Harvard's School of Public Health and/or paid as much, if any, tuition and fees for the Spring 2020 Term at Harvard had he known that the courses would switch to online instruction half-way through the Spring 2020 Term.

27.     Plaintiff Zelasky thus enrolled at Harvard because of the in-person experience, and contracted for and paid Defendant for on-campus instruction, opportunities, facilities, and services for the Spring 2020 Term.

28.     The tuition and fees for which Harvard charged Plaintiff Zelasky were predicated on access to and constant interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology and libraries; opportunities to attend or participate in spectator sports and athletic programs; access to student government and health services; and participation in extracurricular groups and learning, among other things.

29.     Plaintiff Zelasky was specifically deprived of quiet study spaces, phone "pods" and spaces designed to take a video call or interview, gyms, practice rooms for musical instruments as she was part of a school affiliated Latin Band, printers, student clubs such as the Harvard Outing Club and related outdoor gear, and departmental social events.

**C. Plaintiff Ella Wechsler-Matthaei**

30.     Plaintiff Ella Wechsler-Matthaei ("Plaintiff Wechsler-Matthaei") is a citizen and resident of the state of Massachusetts. Plaintiff graduated from Harvard in the Spring of 2020 with a Master's Degree in Education.

31.     Plaintiff Wechsler-Matthaei was enrolled as a full-time graduate student in good standing Harvard's School of Education during the 2020 Spring Term.

32.     Plaintiff Wechsler-Matthaei paid Defendant for opportunities and services that she did not receive, including on-campus education, facilities, services, and activities.

33.     Plaintiff Wechsler-Matthaei enrolled at Harvard to obtain the full experience of live, in-person courses and direct interactions with instructors and students. While Harvard offers some online programs, Plaintiff Wechsler-Matthaei purposefully did not apply to those programs and instead specifically selected an on-campus experience for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide.

34.     Prior to beginning the Spring 2020 Term, and prior to paying tuition and fees, Plaintiff Wechsler-Matthaei consulted Harvard's my.harvard.edu course portal and enrolled in courses for the Spring 2020 Term. In consulting the my.harvard.edu course portal, Plaintiff Wechsler-Matthaei understood and believed that every course in which she enrolled was to be taught in-person. Plaintiff Wechsler-Matthaei was subsequently provided with course syllabi noting the date, time, and on-campus location where the courses would be taught. Indeed, Plaintiff Wechsler-Matthaei's Spring 2020 Term schedule showed that each and every class in which she enrolled was to be taught in-person by listing a specific building and room number in which the courses would be held.

35.     Thus, the in-person nature of the courses was part of the benefit of the bargain, and Plaintiff Wechsler-Matthaei would not have enrolled at Harvard and/or paid as much, if any, tuition

and fees for the Spring 2020 Term at Harvard had she known that the courses would switch to online instruction half-way through the Spring 2020 Term.

36.     Plaintiff Wechsler-Matthaei thus enrolled at Harvard because of the in-person experience, and contracted for and paid Defendant for on-campus instruction, opportunities, facilities, and services for the Spring 2020 Term.

37.     The tuition and fees for which Harvard charged Plaintiff Wechsler-Matthaei were predicated on access to and constant interaction with and feedback from peers, mentors, professors, and guest lecturers; access to technology and libraries; opportunities to attend or participate in spectator sports and athletic programs; access to student government and health services; and participation in extracurricular groups and learning, among other things.

38.     Plaintiff Wechsler-Matthaei was specifically deprived of the use of the libraries for books, studying space, computers and printing, medical facilities, networking and Harvard Graduate School of Education specific events, research facilities, her internships and experiential learning opportunities changed drastically and she was unable to complete her final internship project that was to be held in person, and graduation festivities and robes.

39.     All three Plaintiffs enrolled at Harvard to obtain the full experience of live, in-person courses and direct interactions with instructors and students. Plaintiffs chose Harvard due to the accessibility of professors and camaraderie with their classmates in and out of the classroom. While other schools offered online programs through which they could obtain their degrees, Plaintiffs purposefully did not apply to those programs and instead chose to enroll at Harvard.

40.     Instead, Plaintiffs specifically selected an on-campus experience for the variety of educational and extracurricular opportunities and benefits that only an in-person program can provide. By accepting Harvard's offer of admission when they matriculated, Plaintiffs contracted for

and paid Defendant for on-campus instruction, opportunities, facilities, and services for the entirety of their degree-granting program.

41.     However, on March 10, 2020, Harvard announced that beginning March 23, 2020 (the first day back from Spring Recess), it would transition all classes to virtual instruction until further notice.[3] Furthermore, in late May and early June of 2020, Harvard Medical School, Harvard Law School, Harvard Kennedy School, and the Harvard Graduate School of Education announced that the Fall 2020 Term would occur solely in an online format. In July 2020, Harvard's undergraduate College also announced all Fall 2020 Term courses would take place fully online. Although Defendant allowed some students to return to campus for limited reasons in August 2020,[4] the great majority of classes continued to be taught online through the end of the Spring 2021 Term. In October 2020, Harvard Law School announced that the Winter 2020 Term and Spring 2021 Term would occur fully online as well.

42.     With Harvard's campus closure, cancellation of campus events, suspension of many campus services and programs, and transition to exclusively online instruction halfway through the Spring 2020 Term, Plaintiffs lost access to the on-campus instruction, opportunities, facilities, and services for which Plaintiffs had bargained for by enrolling at Harvard, paying tuition and fees, and foregoing the opportunity to obtain their degree at another school or not at all.

43.     For example, as described above, Plaintiffs lost vital access to campus libraries, as well as the ability to attend or participate in student-organizations, associated student activities, distinguished guest lectures, and events paid for by the student activity fee.

44.     Plaintiffs chose to enroll at Harvard and paid Harvard for on-campus courses and the unique opportunities that come with them, including the ability to communicate directly with

---

[3] https://www.harvard.edu/covid-19-moving-classes-online-other-updates.
[4] https://www.harvard.edu/coronavirus/fall-planning-update/.

professors, utilize campus facilities and laboratories, attend office hours, and work through issues in-person. However, following the campus closure and transition to online courses, these benefits disappeared.

45.     Such a transition made it difficult for students to connect with professors, classmates, and staff, a critical component to the bargained-for on-campus experience.

46.     As a result, while Plaintiffs and Class Members paid for students' in-person access to renowned faculty as essential to the Harvard experience, Defendant excluded students from such access for the Spring 2020, Fall 2020, and Spring 2021 Terms.

47.     Defendant President and Fellows of Harvard College is the legal name of Harvard University, a private university with its principal place of business at 1350 Massachusetts Avenue, Suite 450, Cambridge, Massachusetts, 02138. Defendant provides Class Members with campus facilities, in-person classes, as well as a variety of other facilities for which Defendant charged Plaintiffs and Class Members.

## IV.     FACTS

**A. Harvard encourages prospective students to enroll and sets its tuition and fees based on providing students in-person classes and in-person access to professors, students, and the full array of campus resources.**

48.     Founded in 1636, Harvard is one of the most prestigious schools in the world and is widely considered the pinnacle of higher education in the United States.

49.     Harvard's enormous endowment, the largest in the world, is reflective of the institution's prestige. At nearly $40 billion, the Harvard endowment is larger than half of the world's countries' GDPs.[5]

---

[5] https://www.usnews.com/education/best-colleges/the-short-list-college/articles/10-universities-with-the-biggest-endowments; https://www.boston.com/news/business/2014/09/25/harvards-endowment-is-bigger-than-half-the-worlds-economies.

50.     Rather than use its sizeable endowment to offset rising student tuition costs, Harvard charges tuition in the upper echelon of schools in the United States and globally. Tuition for Harvard College is currently $46,340 per year.[6]

51.     Like most universities in the United States, Harvard's undergraduate tuition has increased dramatically over the last 20 years.[7] For the 2000–2001 school year, Harvard's tuition was just $22,694.[8]

52.     Annual tuition at the graduate and professional schools is even higher than at the undergraduate College. For example, Harvard Law School tuition is $65,875 and Harvard Business School tuition is $73,440.

53.     Furthermore, while many schools nationwide offer and highlight remote learning capabilities as a primary component of their efforts to deliver educational value (*see, e.g.*, Western Governors University, Southern New Hampshire University, University of Phoenix-Arizona), and schools offering full-time online programs are much less expensive, Harvard is not such a school.

54.     Rather, a significant focus of Harvard's efforts to obtain and recruit students pertains to the campus experience it offers along with face-to-face, personal interaction with skilled and world-renowned faculty and staff, a wide array of in-person services, opportunities, and extra-curricular activities, state-of-the-art facilities, and much more.

55.     Each student, including Plaintiffs, applied for and enrolled at Harvard to receive Harvard's campus experience, including in-person instruction and access to campus facilities.

---

[6] https://www.harvard.edu/about-harvard/harvard-glance.
[7] https://www.usnews.com/education/best-colleges/the-short-list-college/articles/10-most-least-expensive-private-colleges.
[8] https://news.harvard.edu/gazette/story/2000/03/2000-01-undergraduate-tuition-and-fees-are-set/.

56.     Through its website and other literature, Harvard highlights its on-campus instruction, the on-campus experience, and Cambridge, Massachusetts as key components of attendance. This is true across Harvard's schools, the degrees it offers, and its disciplines.

57.     Harvard's published website and promotional materials make clear that Harvard intended to provide students, including Plaintiffs, with in-person instruction and access to on-campus facilities for each Term for which students paid tuition and fees and registered for in-person courses.

58.     Harvard recognizes that its website promotes and promises a particular service and educational experience and Harvard markets its on-campus experience as a benefit of enrollment on Harvard's website[9]:

> Harvard's campus creates a stunning backdrop for all that happens within the University.
>
> Harvard offers unparalleled resources to the University community, including libraries, laboratories, museums, and research centers to support scholarly work in nearly any field or discipline.
>
> The Harvard student experience is characterized by unlimited possibilities. Opportunities abound inside the classroom and out, with over 8,000 courses from over 100 departments and countless research programs. Here, undergraduate students have access to almost every extracurricular program imaginable and the largest Division 1 Athletics Program in the country. And after graduation, students join the Harvard Alumni Association, which includes nearly 360,000 alumni worldwide.

59.     Harvard College asserts its mission "is to educate the citizens and citizen-leaders for our society. We do this through our commitment to the transformative power of a liberal arts and sciences education."[10]

---

[9] https://www.harvard.edu/on-campus.
[10] https://college.harvard.edu/about/mission-vision-history#:~:text=The%20mission%20of%20 Harvard%20College,liberal%20arts%20and%20sciences%20education.

13

60.     Harvard's mission continues to emphasize its in-person, on-campus learning experience  "[b]eginning in the classroom with exposure to new ideas, new ways of understanding, and new ways of knowing, students embark on a journey of intellectual transformation."(emphasis added).[11]

61.     Harvard's mission statement not only promises Plaintiffs an in-person learning experience but promotes peer-to-peer interaction and residential living and learning as a way to achieve intellectual and social transformation: "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created. From this we hope that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world."(emphasis added).[12]

62.     In its Vision Statement, Harvard stresses the importance of the in-person learning experience by noting it "sets the standard for residential liberal arts and sciences education."[13] Harvard is "committed to creating and sustaining the conditions that enable all Harvard College students to experience an unparalleled educational journey that is intellectually, socially, and personally transformative."[14]

63.     In its 2019-2020 Faculty of Arts and Sciences Course Catalog, Harvard emphasizes courses provided on-campus routinely offer students advantages and opportunities that are only available through on-campus, in-person instruction.[15] For example, the Catalog's descriptions for

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] https://registrar.fas.harvard.edu/files/fas-registrar/files/fas_course_catalog_2019-2020.pdf?m=1603303609.

Spring 2020 on-campus courses refer to: "hands-on experience,"[16] the use of "state-of-the-art" tools and facilities[17] "laboratory" experience,[18] numerous field trips offered to enhance student study,[19] and dozens of other references to benefits exclusive to on-campus instruction.

64.     Harvard advertises Plaintiff Zelasky's program, the Master of Public Health ("MPH") program necessarily as an in-person experience in the classroom. On its website, it points out that MPH students "will work in a collaborative classroom environment alongside talented students from around the world and from a variety of academic and professional backgrounds."[20]

65.     Additionally, MPH students are able to "take advantage of extraordinary resources of Harvard University and Boston's Longwood Medical Area," and "meet global leaders and work with world-renowned faculty members."[21]

66.     Harvard highlights its location as a perfect setting for a student in Plaintiff Wechsler-Matthaei's program, the Graduate School of Education, noting "Boston is the birthplace of American public education and higher education, and home to hundreds of innovative schools, nonprofit organizations, and education entrepreneurs. Boston and Cambridge provide the ideal intellectual and professional setting for the advanced study of education."[22]

67.     Harvard promotes Plaintiff Barkhordar's program, Harvard Law School's location and campus life in "historic Cambridge, Massachusetts,"[23] which "offers its students a challenging, supportive atmosphere and access to its unmatched array of course and academic offerings, a global alumni network and a bustling campus life."[24]

---

[16] *Id.* at 413, 558, 720, 1017, 1225, 1480, 2432, 2482, 2860, 3105-06, 3124, 3692, 3706.
[17] *Id.* at 720, 747, 1027, 1028, 1215, 1225, 1380, 1423, 3264, 3692.
[18] *Id.* at 268, 354, 377, 381-82, 410.
[19] *Id.* at 338, 771, 779, 782, 1215, 1221, 1380, 1384.
[20] https://www.hsph.harvard.edu/admissions/degree-programs/master-of-public-health/.
[21] *Id.*
[22] http://web.archive.org/web/20200214013802/https://www.gse.harvard.edu/faculty.
[23] https://hls.harvard.edu/dept/jdadmissions/why-harvard/.
[24] *Id.*

68.     In the acceptance materials that Harvard Law School sent Plaintiff Barkhordar,

Harvard said that it "look[ed] forward to welcoming you to campus in the fall." Noting that "[t]he

Harvard Law School experience is distinct, and so is your new cohort," Harvard went on to describe

the many benefits of their unique, in-person interactions:

- "**On campus**, students, professors, and community leaders with diverse perspectives
  engage in robust debates on the most crucial issues of our age."

- "**On campus** and off, you will learn more about the world in three years than many
  people do in a lifetime."

- "The density of thinkers and doers **who come here** from every point on the planet is
  hard to equal."

- "**In 1L sections and student groups, social events and special projects, you will be
  steeped** in the array of cultures, histories, and contemporary perspectives that animate
  legal and intellectual life in society."

69.     Harvard Law School emphasizes the in-person student life experiences offered on

campus: "Whether exploring professional interests, serving the public, or merely socializing, students

engage in an enormous range of activity on the HLS campus beyond the classroom. At present,

there are more than 100 student organizations and journals at HLS. Student organizations based on

social, political, service, or professional interests plan workshops, panels, concerts, networking

opportunities, and conferences for almost every day of the academic year."[25]

70.     Harvard also asserts its "clinical programs bring Harvard Law School students into

the Boston/Cambridge community."[26]

71.     In fact, Harvard Law school's home page emphasizes in-person opportunities such

as "hands-on learning" as part of the clinical experience and "over 500 employers recruit on campus

at HLS each year."[27]

---

[25] https://hls.harvard.edu/about/.
[26] *Id.*
[27] https://hls.harvard.edu/about/.



72.     Harvard Law School emphasizes opportunities for real world, in-person experiences:

HLS students are not satisfied sitting in their dorm rooms and highlighting casebooks. They are looking to transform the world, -one client or one country- at time. From World Court to municipal court, in corporate boardrooms and developing nations, HLS students connect cutting-edge classroom theory to real-world, real-time legal practice and policy development. HLS students are people who want to make an impact. They are changing the face of legal scholarship, altering the course of political events, and improving the lives of individual clients in clinical settings.[28]

73.     Harvard argues that the Graduate School of Education Student Handbook and

School of Public Health Student Handbook absolve it from providing tuition and fee refunds

because the handbooks include disclaimers reserving the right "at any time to make changes to the

Student Handbook that may affect such matters as tuition and other fees, degrees and programs

offered (including modification or possible elimination of degrees and programs), degree and other

_____

[28] https://hls.harvard.edu/dept/jdadmissions/why-harvard/.

academic requirements, academic policies, rules pertaining to student conduct and discipline, fields

or areas of concentration, and other rules and regulations applicable to students."[29]

74.     However, the disclaimers do not apply as Plaintiffs are alleging a contract beyond

just "academic requirements … field and areas of concentration," and include the entirety of the in-

person educational experience from in-person classes to "interactions with faculty, peers, academic

and athletic facilities, affinity and extracurricular groups, and hands-on experiential opportunities."

*See Durbeck v. Suffolk Univ.*, No. CV 20-10985-WGY, 2021 WL 2582621, at *9–11 (D. Mass. June 23,

2021).

**B. Following enrollment at the start of their degree-granting program, the parties' conduct makes clear in-person instruction was a material consideration.**

75.     Up until and including the Spring 2020 Term, later students, including Plaintiffs,

registered for in-person courses, Harvard provided the students with syllabi for each course.

---

[29]  Plaintiffs dispute that any reservation of rights in student handbooks apply to the facts alleged in the Second Amended Class Action Complaint. Pursuant to this Court's June 21, 2021 Order (ECF No. 94, at 19 n.6), Plaintiffs detail the reservation of rights in student handbooks for Plaintiffs' programs below.

Harvard's Law School Handbook did not have a reservation of rights provision in March 2020.

The Graduate School of Education Student Handbook [#35-1] provides that "[r]eview of academic, financial, and other considerations may lead to changes in the policies, rules, and regulations applicable to students; the Harvard Graduate School of Education therefore reserves the right to make changes at any time. These changes may affect tuition and other fees, courses, degrees, and programs offered (including the modification or possible elimination of degrees and programs) degree and other academic requirements, academic policies, rules pertaining to student conduct and discipline, fields or areas of concentration, and other rules and regulations applicable to students." *Id.* at 8.

The School of Public Health Student Handbook [#35-2] states that "[a]t times, a mid-year review of academic, financial or other considerations may lead to a change in policies, rules, and regulations. The Harvard T.H. Chan School of Public Health reserves the right at any time to make changes to the Student Handbook that may affect such matters as tuition and other fees, degrees and programs offered (including modification or possible elimination of degrees and programs), degree and other academic requirements, academic policies, rules pertaining to student conduct and discipline, fields or areas of concentration, and other rules and regulations applicable to students." *Id.* at 1.

76.     These syllabi typically contain course meeting times and physical locations, and physical locations and times for professor and teaching assistant office hours.

77.     These syllabi further set forth various policies applicable to the course, certain of which explicitly reference in-person attendance, including, without limitation, the personal attendance requirements for the courses, which mandate physical attendance at lectures and discussion sections and even policies noting electronic tools that would be necessary for online only education, such as laptops, are prohibited in class.

78.     Plaintiffs attended their Spring 2020 classes in-person when they were offered in-person, i.e., through March 13, 2020.

***Plaintiff Barkhordar's Experience***

79.     For example, in the Spring 2020 Term, Plaintiff Barkhordar was enrolled in Constitutional Law, Contracts, Criminal Law, First Year Legal Research and Writing, and Financial and Legal Needs of Low and Moderate Income Households. For each of these courses, Plaintiff Barkhordar received a syllabus and the majority of the syllabi showed his courses would meet in-person at specific locations on campus.

80.     The syllabus for Plaintiff Barkhordar's Constitutional Law class showed the course was to meet in Wasserstein Hall, Classroom 1023 and his professor would hold office hours in Griswold 450.

**CONSTITUTIONAL LAW**
Professor Erin Delaney
Spring 2020

| **CLASS PERIODS:** | Thursdays & Fridays, 9:30 to 11:30am, Wasserstein 1023 |
|---|---|
| **OFFICE HOURS:** | Thursdays, 3:00 to 5:00pm, Griswold 450 |

81.     The syllabus for Plaintiff Barkhordar's Criminal Law class showed the course was to meet in in-person in the Wasserstein Hall, Caspersen Student Center, and the Clinical Wing ("WCC"), Classroom 2004, and laptops were prohibited in class.

**Criminal Law, Spring 2020**
Mondays & Tuesdays, 1:00-3:00 pm
WCC 2004

| | |
|---|---|
| Prof. Anna Lvovsky | Assistant:  Susan Smith |
| Griswold 404 | Griswold 4S |
| alvovsky@law.harvard.edu | ssmith@law.harvard.edu |

**Laptop Policy**

No laptops or electronic devices will be allowed in class.

82.     The syllabus for Plaintiff Barkhordar's Financial and Legal Needs of Low and Moderate Income Households class showed the course was to meet in the WCC, Classroom 3012.

**FINANCIAL AND LEGAL NEEDS OF LOW AND MODERATE INCOME HOUSEHOLDS**
Spring 2020
Thursday 5 – 7 pm
WCC 3012
01/ 28/2020

*Plaintiff Zelasky's Experience*

83.    During the 2020 Spring Term, Plaintiff Zelasky was in good academic standing and she was enrolled in EH 252: High Performance Buildings for Health, Comfort, and Sustainability; EH 297: Atmospheric Environment; EH 508: Master's Thesis and Collaborative Research in Environmental Health; and ID 215: Environmental and Occupational Epidemiology. For each of these courses, Plaintiff Zelasky received a syllabus and the majority of the syllabi showed her courses would meet in-person at specific locations on campus.

84.    The syllabus for Plaintiff Zelasky's EH 252: High Performance Buildings for Health, Comfort, and Sustainability was showed the course was to be held in-person on Wednesdays at 8:00 am -11:15am in Landmark 414A. This class also incorporated field trips  around campus and in the Boston area throughout the Term, which students were required to attend. In fact, in-person attendance was required for all lectures and all field trips.[30]



**Building for Health:**
**High Performance Buildings for Health, Comfort and Sustainability**
EH 252 | Spring 2019
Wednesday 8:00 am – 11:15 am (EST); Landmark 414A

| Faculty: | Joseph G. Allen, DSc, MPH | Jose Guillermo Cedeño Laurent, SD |
|---|---|---|
| | Assistant Professor | Research Associate |
| | e: jgallen@hsph.harvard.edu | e: memocedeno@mail.harvard.edu |
| | ph: 617-384-8475 | ph: 617-384-8810 |
| | Office hours: By appointment | Office hours: By appointment |
| Teaching Assistant: | Anna Young, MS | |
| | PhD Candidate | |
| | e: ayoung@mail.harvard.edu | |
| | Office hours: By appointment | |

---

https://www.hsph.harvard.edu/public-health-practice-resources/for-students/mph-practicum-information/culminating-experience/.

85.     The syllabus for Plaintiff Zelasky's course EH 297: Atmospheric Environment showed the course was to be held in-person on Wednesdays and Fridays at 11:30 a.m.–1:00 p.m. at Landmark 414A.

**EH297 Atmospheric Environment Seminars (5 Credits)**
**Spring 2020**
**Wednesdays and Fridays 11:30 am - 1:00 pm**
**Location: Landmark 414A**

**Instructors**

Petros Koutrakis, Ph.D.
Professor of Environmental Sciences
Landmark Center West: 410A
Office: (617) 384-8888
Email:  petros@hsph.harvard.edu

Steven Hanna, Ph.D.
Adjunct Associate Professor of Environmental Science
Landmark Center West: 404J
Office: (617)384-8807
Email:  shanna@hsph.harvard.edu

86.     The syllabus for Plaintiff Zelasky's course EH 508: Master's Thesis and Collaborative Research in Environmental Health showed the course was to be held in-person Wednesdays at 3:45 p.m.–7:00 p.m. in Building 1, Room 1302.

*EH 508 - Spring 2020*
*Harvard T.H. Chan School of Public Health*

**Master's Thesis and Collaborative Research in Environmental Health**
**EH 508 [Spring]**
**Building 1, Room**
**1302 Wednesdays**
**3:45pm-7:00pm 5**
**credits**

**Course Instructors:**

Francine Laden, Sc.D.
Professor of Environmental
Epidemiology, Department of
Environmental Health Associate
Professor of Medicine,
Channing Division of Network
Medicine
Associate Chair, Department of Environmental Health
401 Park Drive (Landmark Center) 4th Floor West, Room 404G
Office: (617) 384-8832
Email: francine.laden@channing.harvard.edu

87.     For her Master's Thesis course (EH 508) Plaintiff Zelasky was scheduled for a poster session on May 13, which would have provided Plaintiff Zelasky with the opportunity to present a poster in-person for an academic meeting "in front of [Plaintiff Zelasky's] instructors, classmates, and other available faculty and EH students." However, since the university closed nearly two months prior, Plaintiff Zelasky did not have the experience of presenting the poster project in-person in front of faculty and peers.

88.     The syllabus for Plaintiff Zelasky's course ID 215: Environmental and Occupational Epidemiology. showed the course was to be held in-person on Wednesdays from 2:00-3:30 PM in FXB room G 13.   This course required Plaintiff Zelasky to attend all in-person classes of Spring 2020 Term. Plaintiff Zelasky was assigned to work with a group and provide an in-class presentation.

**Harvard T.H. Chan School of Public Health**
**ID215: Environmental and Occupational Epidemiology**
**Spring 2020**
**Wednesdays 2:00 – 3:30 PM**
**FXB G13**

Instructors
    Tamarra James-Todd, PhD
    Assistant Professor of Environmental Reproductive and Perinatal Epidemiology
    Building 1, 1411
    Office: (617) 432-6460
    Email: tjtodd@hsph.harvard.edu

    Marc Weisskopf, PhD, ScD
    Professor of Environmental Epidemiology and Physiology
    Building 1, 1402
    Office: (617) 384-8872
    Email: mweissko@hsph.harvard.edu

89.     Further, there are numerous in-person requirements to complete the Master's of Public Health Program that Plaintiff Zelasky considered when enrolling at Harvard. Through its curriculum guide, Harvard describes two requirements for all MPH students at accredited Schools of Public Health in the U.S. "Each field of study in the MPH program requires, 1.) an Applied Practice

Experience and 2.) an Integrative Learning Experience, which are components of a practice course or seminar course."[31]

90.     The Applied Practice Experience, or Practicum, "provides an opportunity for students to integrate and apply knowledge and skills from coursework to the types of settings where they will work as public health professionals. Successful public health practice requires the application of practical knowledge and skills."[32]

91.     Harvard's MPH Applied Practice Experience consists of a practicum or field placement where students complete a minimum of 120 hours by working on a project under the guidance of a preceptor at an outside organization. Harvard explains the objective of the "practicum is to help [students] integrate, synthesize and apply the knowledge and competencies from [their] program coursework to a real-world public health problem or issue; explore a substantive public health topic of interest; and enhance the skills needed to function in a professional public health setting."[33]

92.     Harvard details the Integrative Learning Experience consists of "self-assessment, critical reflection on students' professional growth, an demonstration of MPH competencies."[34] These competencies, according to Harvard, are achieved through "successful coursework" and in-person experiences such as "field practice [and] extracurricular activities," as well as "presentation, class based activity."[35] These requirements necessitate the in-person coursework and experiences Plaintiff Zelasky bargained for.

---

[31] https://cdn1.sph.harvard.edu/wp-content/uploads/sites/2096/2018/08/MPH-45-Curriculum-Guide-2018-2019-Final-8.2018.pdf.
[32] https://www.hsph.harvard.edu/public-health-practice-resources/for-students/mph-practicum-information/practicum-guidelines/.
[33] [33] https://cdn1.sph.harvard.edu/wp-content/uploads/sites/2096/2018/08/MPH-45-Curriculum-Guide-2018-2019-Final-8.2018.pdf.
[34] *Id.*
[35] *Id.*

*Plaintiff Wechsler-Matthaei's Experience*

93.     Plaintiff Wechsler-Matthaei was enrolled in the following courses in Spring of 2020: Managing Financial Resources in Nonprofit Organizations; Educational Innovation and Social Entrepreneurship in Comparative Perspective; Power and Pedagogy: Self, Society and Transformation; Leading Strategically, Building Skills for Effective Leadership; and Educating to Transform Society- Preparing Students to Disrupt and Dismantle Racism.

94.     The syllabus for Plaintiff Wechsler-Matthaei's course Managing Financial Resources in Nonprofit Organizations showed the course was to meet in-person on Tuesdays and Thursdays from 8:30 am. to 10:00 am and the instructor had office hours at Gutman Library room 448.

**HARVARD UNIVERSITY**
**GRADUATE SCHOOL OF EDUCATION**

A-027B/MLD-427B
**MANAGING FINANCIAL RESOURCES IN NONPROFIT ORGANIZATIONS**
**Spring 2020**

| | |
|---|---|
| Instructor: | Staff Assistant: |
| James P. Honan, Senior Lecturer on Education | Till Freitag |
| Office:  Gutman Library 448 | Gutman 464 |
| Phone:  617-496-8131 | 617-384-5502 |
| e-mail:james_honan@harvard.edu | e-mail: freitati@gse.harvard.edu |
| Office hours: Sign-up sheet posted at Gutman 448 | |
| The course teaching assistants will be available during posted hours. | |

**ATTENDANCE**
The class meets on Tuesdays and Thursdays from **8:30 A.M. to 10:00 A.M.**

95.     The syllabus for Plaintiff Wechsler-Matthaei's course Educating to Transform Society-Preparing Students to Disrupt and Dismantle Racism class was scheduled to meet Mondays from 4-7 pm in Longfellow Room 319.

**T014: 1.25 VERSION**
**Educating to Transform Society –**
**Preparing Students to Disrupt and Dismantle Racism**
Mondays 4-7, Longfellow 319
**Instructor:** Aaliyah El-Amin, Ed.D (pronouns: she, her, hers)

96.     The syllabus for Plaintiff Wechsler-Matthaei's course, "Educational Innovation and Social Entrepreneurship in Comparative Perspective" notes this is a course that "brings together a diverse group of students from various professional schools and concentrations at Harvard." The syllabus described the course as a "hands on course" that "hopes to cultivate students' entrepreneurial spirit and help students gain an understanding of the challenges of the starting up process, offering space and structure for participants to begin developing their own venture plan . . . ." Students were also expected to present their final enterprise at an in-person conference at the end of the course.

97.     Harvard, on the one hand, enticed students to matriculate at Harvard, and offered students, including Plaintiffs, the ability to register for courses explicitly represented to be in-person courses.

98.     Students, in turn, including Plaintiffs, accepted that offer by (1) matriculating at Harvard, while foregoing the opportunity to enroll at other schools or defer their education; (2) paying a deposit, tuition, and fees to Harvard to obtain their degrees in an in-person, on-campus format for the duration of their education; and/or (3) registering for the offered in-person courses for the Spring 2020 Term. Students only agreed to enroll at Harvard and pay Harvard's costly tuition based on Harvard's promise to provide exactly what online classes cannot: an in-person learning experience

99.     Plaintiffs and Harvard's conduct evidenced their meeting of the minds on the material term that Harvard would provide in-person courses and access to on-campus facilities: Harvard provided the courses in-person and required the physical attendance of each student, including Plaintiffs, until March 13, 2020 and each student, including Plaintiffs, attended their courses in-person until March 13.

100.    Among other things, that experience includes the interactions that occur with professors before, during, and after class. It also includes the spontaneous interactions that occur with fellow students before, during, and after class.

101.    And it includes access to Harvard's libraries, which has books, archives, and other resources that are only accessible in person. The in-person learning experience also includes access to study spaces.

102.    Other key facets of the experience include (but are not limited to):

- Face to face interaction with professors, mentors, and peers;

- Access to facilities such as libraries, laboratories, computer labs, and study rooms;

- Student governance and student unions;

- Extra-curricular activities, groups, intramural sports, etc.;

- Student art, cultures, and other activities;

- Social development and independence;

- Hands-on learning and experimentation, including labs and clinical education opportunities;

- Networking and mentorship opportunities; and

- In-person interactions with potential employers.

**C. Plaintiffs and Class Members enrolled at Harvard and paid tuition and fees for the Spring 2020 Term with the expectation of in-person learning.**

103.    When Plaintiffs and Class Members accepted Harvard's offer of admission to each of their degree granting programs, and paid their deposits, tuition, and fees as consideration, Plaintiffs and Class Members contracted with Harvard—and paid a premium—specifically for on-campus courses and programs for the entirety of their program.

104.    Defendant's usual and customary practices when students register for on-campus courses and pay tuition for such courses is to provide on-campus instruction. Plaintiffs' and Class

27

Members' reasonable expectation when accepting Harvard's offer of admission was that those classes would be provided on-campus for the entirety of their program, consistent with Defendant's usual and customary practice.

105.    Plaintiffs and Class Members had the reasonable expectation that Defendant would provide the in-person educational experience and use of its facilities provided in Defendant's publications, including but not limited to the catalogs, manuals, handbooks, bulletins, brochures, advertisements, and other promotional materials.

106.    The combination of the express terms of Defendant's publications and Defendant's usual and customary practice constituted an offer to any prospective students considering Harvard's offer of admission. Once accepted by Plaintiffs and Class Members, who did in fact enroll at Harvard and register for such on-campus classes, in accordance with Harvard's policies and procedures and usual custom and practice, and who timely paid tuition for those on-campus classes, Defendant became contractually obligated to provide on-campus classes to Plaintiffs and Class Members for the entirety of their program.

107.    Undergraduate tuition for the Spring 2020 Term at Harvard is approximately $23,865. Other fees include, but are not limited to, a Student Health Fee, Student Services Fee, and a Student Activity Fee.

108.    Spring 2020 Term graduate tuition at Harvard varies on area of study and year of study, but most PhD and master's programs charge $24,004 per Term for the first two years of study. Harvard Business School costs approximately $36,720 for the Spring 2020 Term and Harvard Law School costs approximately $32,937 for the Spring 2020 Term. Graduate students are also charged fees similar to the undergraduate fees listed above.

109.    Spring Term classes at Harvard began on January 27, 2020. Classes for the Term ended on April 29, 2020 and the final examination period ended on May 16, 2020.

110.     Plaintiffs selected Harvard because of the networking and collaboration with professors and professionals offered through Harvard's on-campus program. Plaintiffs contracted with Defendant and agreed to pay the high cost of Harvard's on-campus tuition because the program offered access to opportunities that were based on in-person classes and study.

111.     Plaintiffs and Class Members paid Harvard tuition and fees for on-campus courses—and the benefits, services, opportunities, and facilities that came with them—for the Spring 2020 Term. In registering and paying Harvard tuition and fees for the Spring 2020 Term, Plaintiffs and Class Members understood and had the reasonable expectation, per Harvard's publications and Harvard's usual and customary practice, that the classes they bargained and paid for would be administered on-campus for the duration of the Term and the entirety of their degree granting program. However, as set forth further below, Plaintiffs were not permitted to attend classes on-campus or have access to campus benefits for a large portion of the Spring 2020 Term.

112.     In addition, Plaintiff Barkhordar and Class Members paid Harvard tuition and fees for on-campus courses—and the benefits, services, opportunities, and facilities that came with them—for the Fall 2020 Term and Spring 2021 Term. In accepting Harvard's offer of admission, Plaintiff Barkhordar and Class Members understood and had the reasonable expectation, per Harvard's publications and Harvard's usual and customary practice, that the classes they bargained and paid for would be administered on-campus for the entirety of their degree granting program. However, as set forth further below, Plaintiff Barkhordar and Class Members were not permitted to attend classes on-campus or have access to campus benefits for the Fall 2020 Term or Spring 2021 Term.

**D.  Harvard ends in-person classes and moves to online instruction without issuing a tuition refund.**

113.     On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later,

researchers in China identified a new virus that had infected dozens of people in Asia, subsequently

identified and referred to as the novel coronavirus, or COVID-19.

114.    By January 21, 2020, officials in the United States were confirming the first known

domestic infections of COVID-19.

115.    Due to an influx of thousands of new cases in China, on January 30, 2020, the World

Health Organization officially declared COVID-19 as a "public health emergency of international

concern."

116.    By March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

117.    Travel and assembly restrictions began domestically in the United States on March

16, 2020, with seven counties in the San Francisco, California area announcing shelter-in-place

orders. Other states, counties, and municipalities have followed the shelter-in-place orders and as of

April 6, 2020, 297 million people in at least 38 states, 48 counties, 14 cities, the District of Columbia,

and Puerto Rico are being urged or directed to stay home.

118.    As it relates to this suit, on March 10, 2020, Massachusetts Governor Charlie Baker

declared a state of emergency, giving local officials more flexibility to respond to the Coronavirus

outbreak.

119.    On the same day, March 10, 2020, Harvard announced on its website and in an email

to students and faculty from President Lawrence S. Bacow that beginning March 23, 2020 (the first

day back from Spring Recess), it would transition all classes to virtual instruction until further notice:

Dear Members of the Harvard Community,

Like all of you, I have been intently following reports of Coronavirus Disease 2019
(COVID-19) and considering the many ways in which its future course might alter my life
and the lives of those closest to me. These past few weeks have been a powerful reminder of
just how connected we are to one another—and how our choices today determine our
options tomorrow.

Fortunately, a group of extremely dedicated people has been working literally around the
clock to respond to the challenges posed by COVID-19. Our teams are considering every

contingency as they undertake their important work, and I write today to update you on major near-term changes that will limit exposure to the disease among members of our community:

- We will begin transitioning to virtual instruction for graduate and undergraduate classes. Our goal is to have this transition complete by Monday, March 23, which is the first day of scheduled classes following Spring Recess.

- Students are asked not to return to campus after Spring Recess and to meet academic requirements remotely until further notice. Students who need to remain on campus will also receive instruction remotely and must prepare for severely limited on-campus activities and interactions. All graduate students will transition to remote work wherever possible. Schools will communicate more specific guidance and information, and we encourage everyone to review prior guidance about both international and domestic travel.

- We are transitioning over the course of the next few days to non-essential gatherings of no more than 25 people. Please note this is a change from prior guidance.

The decision to move to virtual instruction was not made lightly. The goal of these changes is to minimize the need to gather in large groups and spend prolonged time in close proximity with each other in spaces such as classrooms, dining halls, and residential buildings. Our actions are consistent with the recommendations of leading health officials on how to limit the spread of COVID-19 and are also consistent with similar decisions made by a number of our peer institutions. The campus will remain open, and operations will continue with appropriate measures to protect the health of the community.

For regular updates and additional information, please visit this dedicated webpage. Provost Alan Garber, Executive Vice President Katie Lapp, and HUHS Executive Director Giang Nguyen will continue to send you updates by email as needed. You will also continue to receive School- or Unit-specific information from local leadership. If you are a student or faculty member and have specific questions or concerns, I encourage you to be in touch with the contacts identified by your dean. If you are an employee, I encourage you to be in touch with your manager.

Despite our best efforts to bring the University's resources to bear on this virus, we are still faced with uncertainty—and the considerable unease brought on by uncertainty. It will take time for researchers, a good many of them who are our colleagues, to understand enough about this disease to mount a reliable defense against it. Now more than ever, we must do our utmost to protect those among us who are most vulnerable, whether physically or emotionally, and to treat one another with generosity and respect. Please remember that Harvard Counseling and Mental Health Services and the Harvard Employee Assistance Program are available to help you manage anxiety and stress. Your mental health is just as important as your physical health.

To our students, I know it will be difficult to leave your friends and your classrooms. We are doing this not just to protect you but also to protect other members of our community who may be more vulnerable to this disease than you are.

To our faculty, I recognize that we are asking you midway through the semester to completely rethink how you teach. We do this because we know that you want to avoid putting your students at risk.

To our staff, I understand that we are expecting you to go above and beyond in your efforts to support our important mission of teaching and scholarship. We do this because we know we can rely on your creativity, flexibility, and judgment through these challenging times.

I am proud to be a member of a community where people put the greater good above their own self-interest. Thank you for your patience and your resilience as we all learn to temper increased distance with deeper care for one another.

With appreciation,
Larry

120.    In doing so, President Bacow stressed the importance of in-person educational experiences and the difficulty of online learning: "To our students, I know it will be difficult to leave your friends and your classrooms . . . to our faculty, I recognize that we are asking you midway through the semester to completely rethink how you teach."

121.    Shortly after President Bacow's announcement, Harvard closed almost all of its campus facilities and Harvard has not held any undergraduate or graduate in-person classes since March 13, 2020.

122.    Following the closure of its facilities in March 2020, Defendant did not deliver the educational services, facilities, access, and opportunities that Plaintiffs and Class Members contracted and paid for during the Spring 2020 Term, Fall 2020 Term, or Spring 2021 Term. Defendant did not issue any sort of compensatory tuition reimbursement or tuition reduction.

**E.  Harvard maintains virtual instruction for the Fall 2020 Term without any reduction in tuition or fees.**

123.    In May 2020, Harvard announced the continued closure of Defendant's facilities during the upcoming Fall 2020 Term.

124.    For example, on June 3, 2020, Harvard Law School Dean John Manning sent the

following announcement to current and incoming law students and faculty:

Dear HLS Students,

I write to update you on our plans for Fall Term 2020. We have all hoped these past few
months that the upcoming academic year could begin, at least in part, on campus. However,
in light of the daily news about the continuing health risks of the pandemic, advice from
public health experts, and the very real concern that testing will not yet be available on the
scale or frequency needed to adequately monitor COVID-19-related illness in the Harvard
community, we have found it necessary to conclude that Fall Term 2020 will be online.

This is not the announcement we'd hoped to make. But our first priority is, and must
continue to be, the health and safety of our community, and we cannot reliably conclude at
this time that we can safely provide an effective on-campus program this fall. We recognize
that the public health situation may evolve between now and the end of August, and we
dearly hope, as everyone does, that scientific developments with respect to COVID-19 will
allow greater in-person activity, here and elsewhere, very soon. We also recognize, however,
that you must be able to make appropriate plans for the coming semester and year, and that
we owe it to you to communicate a decision sufficiently far in advance to enable you to do
so. So, while we will keep you apprised as we learn more, we must now turn our focus fully
to developing the best, most robust, highest-quality online academic, clinical, and
extracurricular programming we can for the coming term.

We look forward to teaching—and learning from—you and to forming with you, as we do
each year, an active and engaged community of learning and service. The Harvard Law
School faculty is already hard at work adapting their teaching plans in order to offer the best
online courses and clinics possible. In order to be prepared in the event it proved necessary
again to teach and learn online, we have been busy, in recent weeks, studying and absorbing
the latest research about how students best learn online and identifying the range of tools,
techniques, and approaches that create excellent, engaging online courses. And we have
extensively surveyed our faculty and (as you know) our students to gain insights from last
spring's online teaching experience, with an eye toward tailoring best practices in online
learning to the distinctive pedagogy of the law school classroom. We have also learned from
last spring's experience that our clinics can successfully design and offer compelling,
meaningful online opportunities for learning and for service to communities in need. It is an
exciting process, with much to be learned and much new to try in our virtual classrooms and
clinics. I'm inspired by the creativity and dedication with which faculty are planning for the
fall as we work to nurture a vibrant, connected online community.

We also have been working to identify and develop channels for creating meaningful
interactions and connections outside the classroom and for supporting the extracurriculars
that are an integral part of your law school experience. As part of this programming, we are
creating additional opportunities for advising and career planning, as well as a robust set of
online events. We look forward to engaging student organization leadership in the coming
weeks to learn more about—and to find ways we can support—their plans for fostering
student engagement in the coming year. For incoming students, we are planning

33

comprehensive orientation programs, with a particular focus on small group meetings so that you can get to know your classmates and our staff and faculty better before the term begins. Incoming JD students will have the opportunity to meet your section leaders and classmates not only during orientation, but in small groups beforehand, and LL.M students will be able to connect with classmates, Graduate Program leadership, and faculty members prior to the start of the term.

With the news that Fall Term 2020 will be online, you will have many specific questions about what to expect. Given rapidly changing circumstances, we will not be able to answer all of these questions here, but hope that these FAQs will begin to answer many of the most important ones. We very much want to learn more about the concerns you may have, and the circumstances you may face, as you prepare for the months ahead—including where you are, or are likely to be, physically located in the fall and which of your specific questions we have not yet addressed. **To that end, we will soon circulate a brief survey that will help us as we plan an engaging and enriching fall program and as we advise you about how to navigate the educational challenges created by this pandemic. We will ask that you please respond by 5:00 p.m. Friday, June 5, so that we can take your specific questions into account in our planning.** We will continue to update the FAQs as we learn more in the days and weeks ahead.

In the meantime, we are working hard to address the fact that the shift to a full semester of online learning will pose particular challenges for some – for example, those who face difficult learning environments at home, those who have technological challenges, or those in time zones remote from that of Cambridge who may find it difficult to participate in classes in real-time, as is required by the active-learning approach to law school pedagogy. We are seeking ways to mitigate those challenges, for example, by supplementing existing grant aid with the development of a new Technology Assistance Fund that will provide up to $1 million to help our students address technological obstacles to participating fully in online learning; by giving priority in the allocation of limited HLS dormitory housing to those facing technological or other circumstances that make it difficult to engage in online learning at home; and by working to identify, if possible, ways to increase the courses available in time slots that are easier for students in remote time zones.

We realize that, for a variety of reasons, an online learning experience may not be optimal for all of you and that international students, in particular, may face some unexpected challenges relating to travel and to visa status this coming year. Accordingly, we will offer an additional deferral period for our newly admitted JD and LL.M students. The new period will run from June 15 through June 19. We will also extend from June 15 to June 19 the deadline for returning students to opt for a fall-semester or full-year leave during Academic Year 2020–2021. To help you make your decision, our faculty and student services staff will be available to advise you. We will also continue to update our FAQs as we learn more. We very much hope that you choose to remain in what we expect to be an exciting and enriching online academic and social program. But we want to be sure that you have a fair opportunity to make a decision that is right for you based on the best information we can provide you at this time.

Last spring, we had to adapt quickly to new formats and unexpected locations for learning and teaching. The fact that this unprecedented transformation was achieved with so little

time to plan was a testament to our community. I am grateful to everyone—our students, faculty, and staff—for all they did to create an effective and enriching learning experience in challenging circumstances. This coming semester, though, asks something different of us— to use technology to design even more creative, exciting, and excellent experiences in support of learning, building community, and engaging in the service that helps those most in need and that is fundamental to the work lawyers do. This is our work now, as we take this next important step together. I look forward to working with all in this extraordinary community as we embrace new opportunities and challenges.

Best,

John Manning

125.    Upon information and belief, Harvard conducted virtual classes at many of its

degree-granting schools during the Fall 2020 Term.

126.    Despite the fact that the Fall 2020 Term occurred solely in an online format,

Defendant maintained the tuition for each Harvard school for the Academic Year 2020–2021 at the

2019–2020 level.

**F.  Harvard maintains virtual instruction for the Spring 2021 Term without any reduction in tuition or fees.**

127.    In October 2020, Harvard announced the continued closure of Defendant's facilities

during the upcoming Spring 2021 Term (and any students taking classes during the Winter 2020

term).

128.    For example, on October 20, 2020, Harvard Law School Dean John Manning sent

the following announcement to current law students and faculty:

Dear HLS Students,

I write today to update you on our plans for Winter and Spring Terms 2021. Though we had very much hoped to be able to resume teaching and learning on campus, we have with great disappointment concluded that it is neither prudent nor equitable for us to resume in-person instruction. We miss seeing you all in person tremendously. And we understand and regret that today's decision will land hard with many of you. We did not come to it lightly. After dedicated teams of faculty and staff conducted extensive fact-gathering, careful analysis of alternatives, and consideration of input from students, faculty, staff, and public health experts, the choice, though difficult, was for several reasons clear.

First, our foremost consideration is keeping our community safe amidst growing uncertainties surrounding the pandemic's trajectory. Alongside a resurgence of COVID-19 internationally, the U.S. is now experiencing its third spike in COVID-19 cases since March, and cases have recently been on the rise in Massachusetts, as more communities in and around Boston and the eastern half of the Commonwealth have been deemed high risk. With large unanswered questions about the impact of cold weather on the virus' transmission and the potential interaction of COVID-19 with seasonal flu, we believe that the risks and uncertainties associated with the pandemic in the Winter and Spring Terms are simply too great to justify a significant return of students, staff, and faculty to campus.

Second, what we have learned this fall is that our faculty have found creative and effective ways to adapt online practices to the distinctive pedagogy of law school; that our students have been present and engaged in the classroom and clinical experience; and that classes and clinics are generally going well. After broad consultation at HLS and with colleagues at other schools, we have concluded that pedagogical considerations not only justify, but favor, the continuation of online instruction at present. In making the decision we are sharing today, we exhaustively considered all aspects of offering classes on the HLS campus under current public health regulations and best practices, including CDC and state guidance for required physical distance. Under applicable constraints, the alternative to online instruction is not, as we all would wish, in-person instruction, but rather a form of hybrid learning. For example, in a typical Socratic class, only a fraction of the students could be present in the classroom on any given day; others would have to participate remotely from home; and both the teacher and in-person students would be required to wear masks, hindering the ability of everyone, especially those participating from home, to hear what is being said and to read expressions in a way that would contribute nonverbal communication to classroom dialogue. Even for small-class experiences, moreover, we concluded that hybrid learning does not capture the benefits of either fully in-person or fully online instruction.

Third, and as important, we believe that considerations of equity strongly favor continuing with online instruction. Hybrid classes differentiate the educational experience among students not only on any given day, but also across the semester. Such classes are not equally accessible to students who come from countries subject to a travel ban, who face other difficulties securing visas, who have family or personal obligations or challenges that compel them to remain where they are now, or who suffer from underlying conditions that place them at high risk of serious illness should they contract COVID-19. Especially given the nature of our pedagogy, it seemed to us problematic to create a tiered experience in which only some of our community could engage in the forms of classroom instruction being offered.

In short, given the range of imperfect options before us, we have concluded that it is best for faculty to continue to focus on delivering the best online academic program possible to all students equally, rather than moving to hybrid courses that, given the public health constraints, treat students differently without any assurance of providing a superior learning experience.

While we recognize that the public health situation may change between now and the new year, and we of course very much hope that scientific developments will allow greater in-person activity very soon, we also recognize that students, staff, and faculty must have

36

sufficient time to make appropriate plans for the remainder of the school year. We know that this decision will be disappointing to many and, as we've said before, we remain committed to resuming in-person instruction and regular campus life when it is safe and feasible to do so. In the meantime, please know that in the weeks ahead, we will continue to listen and solicit feedback as we find ways to improve the online experience and to mitigate the challenges that some students have reported this fall. Reflecting some of your feedback to date, we are launching a number of new initiatives and continuing several others, including:

- Creating, this spring, as we did this fall, **new courses in time-zone friendly teaching blocks** for students in remote time zones.

- Providing additional opportunities for **small group interactions** with teachers and fellow students through:

    - The creation of opportunities for new HLS students (1Ls, transfer students, and LL.Ms) to get to know faculty and one another through a series of spring **Reading Groups** modeled on the 1L reading groups;

    - The establishment of **Writing Groups** that will give upper-level students (2Ls, 3Ls, and LL.Ms) the chance to work in small groups with a professor and peers to develop, write, and workshop student papers;

    - Resumption of **student-faculty coffee** and **student-faculty lunch opportunities** (in an online format), with food paid for by the Law School;

    - Continuation of enhanced support for additional **Teaching Fellow** positions.

- Making available new **on-campus housing options** for students who have encountered unexpected challenges pursuing an online education in their home environments.

- Providing **emergency dependent care** support for students.

- Renewing support to those eligible for the **Technology Assistance Fund** and expanding covered equipment expenses to include standing desks, ergonomic chairs, and other academic-related supplies.

- Providing a stipend **for textbook shipping expenses** for international students.

- Providing student funding to cover the cost of printing **course packs** during the period of remote learning.

- **Streamlining the recording request** process to cut the time required for requesting a class recording for personal or medical emergencies from three days to three hours in most instances.

In addition, mindful of the fact that, because of the pandemic, many students will be unable to be on campus their final year here or, in the case of LL.Ms, their entire time at HLS, we will also be consulting with students, staff, and faculty in the weeks ahead to identify creative ways to bring Class of 2021 students back to campus, when the pandemic abates, to spend meaningful time with classmates, friends, and teachers.

Knowing there will inevitably be many questions that arise for each of you, we've updated our Academic Year 2020-2021 FAQs to provide as much information as possible. We will continue to add new information as more details are developed. Our Student Services offices are also available to consult with students about their individual circumstances. Contact information and office hours can be found here.

We understand that, for a variety of reasons, another semester of online learning may not be optimal for some of you. **To ensure that every student has sufficient time to consider this important question, we are extending the leave of absence deadline for Winter Term and Spring Term leaves to December 1, 2020.** (The form for requesting a leave is available here.) We encourage anyone who may be considering a leave to reach out to one of our Student Services offices for additional information and support.

This has been a challenging year for everyone at HLS and around the globe. The circumstances that each of you has faced vary greatly, and we know that adapting to the changes required by this pandemic has been difficult. If you are struggling and in need of support, please reach out to the Dean of Students Office or the Counseling and Mental Health Services at HUHS. Please know that we are here for you.

Please also know that we are fully committed, as always, to providing you with an exceptional education and to working together to build an inclusive community of learning and service. In this time of great difficulty, I am grateful to be part of this dedicated and remarkable community. We may be physically separated at present, but we remain united in our shared educational mission and in the common purpose of finding new solutions to serious and deeply rooted problems that excellent lawyers can and must help solve. We look forward to teaching, learning from, and working with you in the months ahead.

Be well.

All best,

John Manning

129.     Upon information and belief, Harvard conducted virtual classes at many of its

degree-granting schools during the Spring 2021 Term.

130.     Despite the fact that the Spring 2021 Term occurred solely in an online format,

Defendant maintained the tuition for each Harvard school for the Academic Year 2020–2021 at the

2019–2020 level.

**G. Harvard's refusal to refund and/or reduce its tuition harms Plaintiffs and Class Members.**

131.    As students who will no longer receive the educational services, facilities, access, and opportunities that they were promised when they matriculated, Plaintiffs and all other Class Members have suffered significant economic damages as a direct result of Harvard's refusal to lower tuition and fees for the Spring 2020 Term, Fall 2020 Term, and Spring 2021 Term.

132.    Though the reasons for Harvard's continued closure may be justified, the fact remains that such a closure presents significant losses to Plaintiffs and Class Members as even Defendant's own communications recognize.

133.    Students across the country have offered apt descriptions of the loss they have experienced as a result of the pandemic, highlighting the disparity between students' bargained for educational experience and the experience that colleges and universities, including Defendant, now provide.

134.    For example, as reported in The Washington Post, one student "wonders why he and others . . . are not getting at least a partial tuition refund. Their education, as this school year ends in the shadow of a deadly pandemic, is nothing like the immersive academic and social experience students imagined when they enrolled. But tuition remains the same: $27,675 per semester . . . . 'Our faculty are doing a good job of working with us,' said Patel, 22, who is from New Jersey. 'But at the end of the day, it's not the same as in-person learning. . . . It shouldn't just be a part of the business model where, no matter what happens, you have to pay the same amount. The cost needs to reflect some of the realities.'"[36]

135.    As another example, as reflected in a Change.org petition, with nearly 5,000 supporters, students at another major university highlight the loss experienced by students: "As a

---

[36] https://www.washingtonpost.com/education/2020/04/16/college-students-are-rebelling-against-full-tuition-after-classes-move-online/.

result of the COVID-19 global pandemic crisis, Governor Pritzker has declared a state of emergency in Illinois. In response, Northwestern University made the sensible decision to offer all Spring 2020 courses online for the start of the quarter and will likely extend this to the rest of the quarter as the situation worsens. While this is certainly the right call to ensure the health and safety of all students, Northwestern's tuition and fees do not accurately reflect the value lost by switching to online education for potentially an entire term. For the following reasons, we are seeking a partial refund of tuition and full refund of room and board for the Spring 2020 quarter. Since Northwestern is a top private university, the estimated annual cost of attendance of $78,654 goes towards a comprehensive academic experience that cannot be fully replicated online. Due to the COVID-19 crisis, students paying for the Northwestern experience will no longer have access to invaluable face-to-face interaction with faculty, resources necessary for specific programs, and access to facilities that enable learning."[37]

136.    Another university's student newspaper reflects another example: "At this time, most of the campus and dorms need not be rigorously maintained. No events will be held, nor speakers hosted. The world-class education that consists in having opportunities to work and interact with academics and peers (not to mention the vast numbers of innovators, creators, doctors, organizers, and more that congregate on our campus) will no longer be provided."[38]

137.    Harvard students similarly called for tuition refunds. In the Harvard Crimson, School of Public Health student Bryan O. Buckley noted "changes in quality of education, future economic insecurity in light of the pandemic, and inability to cultivate a professional network on campus as reasons why students are pushing for reimbursements." He continued, " . . . I also think one of the rich parts about being at Harvard [. . .] is also the social capital that you're able to make while here at

---

[37] https://www.change.org/p/northwestern-university-tuition-fees-reduction-for-spring-2020.
[38] https://www.chicagomaroon.com/article/2020/3/19/uchicago-lower-tuition-spring-2020/.

Harvard. The connections that you're able to make, the people that you're able to see, a lot of the programming that you're able to attend."[39]

## H.    Economic Damages

138.    Plaintiffs and Class Members are entitled to compensation for services not received in the Spring 2020 Term, Fall 2020 Term, and Spring 2021 Term. Even if Defendant did not have a choice in cancelling in-person classes, it nevertheless improperly attempts to retain and continue to charge funds for services it did not provide.

139.    Plaintiffs and Class Members did not intend to attend an online educational institution, but instead enrolled in Defendant's institution on an in-person basis. The remote learning option is not the equivalent of the in-person education putative Class Members were promised when they committed to attend Harvard.

140.    Moreover, a remote education is not worth what Defendant charged Plaintiffs and Class Members. The tuition and fees for in-person instruction at Harvard are higher than tuition and fees for Harvard's other online courses and programs because such costs cover not just the academic instruction, but encompass an entirely different learning and living experience, as described above.

141.    Furthermore, by offering some students—but not all—the opportunity to request a one-year deferral, Defendant offers Plaintiffs and some Class Members a coercive choice.[40] Students may either pay the outrageous tuition and fees Defendant demands or interrupt their planned education. For current students, a deferral would not only amount to an interruption in education but would also result in the waste of tuition and fees previously paid to Defendant. To be sure,

---

[39] https://www.thecrimson.com/article/2020/4/6/grad-students-tuition-reimbursements/.
[40] For instance, while the Law School offered students the opportunity to defer (albeit on short notice), the Graduate School of Education did not offer students the opportunity to defer at all.

however, Defendants have already breached their contract with students regardless of their offer of deferral.

142.     Plaintiffs and Class Members are thus entitled to a proportionate reimbursement of tuition and fees for the Spring 2020 Term, Fall 2020 Term, and Spring 2021 Term. Such a reimbursement must be proportionate to the significantly lesser experience an online education provides as compared to a traditional in-person experience.

## V.     CLASS ACTION ALLEGATIONS

143.     Plaintiffs incorporate by reference all the foregoing allegations.

144.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

145.     Plaintiffs seek to represent the following Class:

> All people paying tuition to one of Harvard's 12 degree-granting schools in whole or in part, personally and/or on behalf of others, for on-campus instruction during the Spring 2020 Term.

146.     Specifically excluded from the Class is Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

147.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

148.     The Class, and their counsel, satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and 23(g) and the requirements of Rule 23(b)(3).

149.   **Numerosity and Ascertainability.** The members of the Class are geographically dispersed throughout the United States and the world and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiffs reasonably estimate that there are thousands of members in the Class. As noted above, Harvard has at least 20,000 students across its degree-granting schools. Although the precise number of Class Members is unknown to Plaintiffs, the true number of Class Members is known by Defendant and may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

150.   **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

   a)   whether Defendant charged the same amount of money to Class Members in exchange for a significantly reduced service compared to what Class Members originally accepted when they paid for the Spring 2020 Term;

   b)   whether Defendant plans to charge the same amount of money to Class Members in exchange for a significantly reduced service compared to what Class Members originally expected for the upcoming Fall 2020 Term;

   c)   whether Defendant will provide the services the Class Members originally accepted in exchange for commitment to the school and payment of tuition and fees;

   d)   whether Class Members are entitled to a reimbursement of tuition and fees for the prior Spring 2020 Term and a reduction of tuition and fees for the upcoming Fall 2020 Term;

   e)   whether Defendant plans to unlawfully convert money from Plaintiffs and the Class; and

   f)   whether Defendant is liable to Plaintiffs and the Class for unjust enrichment.

151.   **Typicality.** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Harvard's substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal

theories on behalf of themselves and all other members of the Class that they represent. Further, there are no defenses available to Defendant that are unique to Plaintiffs.

152. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class.

153. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would thus be impossible for the Class to obtain effective redress for the wrongs committed against them on an individual basis. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase delay and expense to all parties and the court system. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

154. In the alternative, the Class may also be certified because:

a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the Defendant;

b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not party to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## VI.    CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT—Spring 2020 Term

155.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Class against Defendant.

156.    Plaintiffs and Class Members entered into identical, binding contracts with Defendant by accepting Defendant's offer to enroll in one of Defendant's degree-granting programs and registered for on-campus classes in accordance with the terms of Defendant's publications and Defendant's usual and customary practice of providing on-campus courses. Furthermore, through the payment of tuition and fees for the prior Term(s) at Defendant's institution, Plaintiffs and Class Members who were current students at Harvard during the Spring 2020 Term (distinguished from incoming students) entered into an additional agreement with Defendant to complete their education at Harvard in the traditional in-person format.

157.    It was the reasonable expectation of Plaintiffs and Class Members and Defendant that Defendant would provide on-campus—as opposed to online—classes and instruction, and use of Defendant's facilities as mutually agreed in accordance with Defendant's usual and customary practice of providing on-campus courses, and as provided in Defendant's publications, including but not limited to the policies, procedures, brochures, advertisements, and other promotional materials throughout the entirety of Plaintiffs' attendance while pursuing their degrees.

158.    Under their contracts with Defendant, and Defendant's usual and customary practice of providing on-campus courses, Plaintiffs and Class Members registered for on-campus courses and paid Defendant tuition and fees for Defendant to provide in-person instruction and access to Defendant's facilities.

159.     As part of these contracts, and in exchange for the aforementioned consideration, Defendant promised to provide certain services, all as set forth above. Plaintiffs and Class Members fulfilled their end of the bargain when they enrolled at Harvard, registered for classes, and payed tuition and fees for on-campus courses and access to on-campus facilities and services.

160.     The reported tuition for the Spring 2020 Term was intended to cover in-person education services. In exchange for committing to attend Harvard and paying the reported tuition and fees (including in prior Terms), Class Members were entitled to on-campus courses and access to on-campus facilities and services for the Spring 2020 Term.

161.     Defendant did not provide the contracted for services for the Spring 2020 Term. Instead, Defendant transferred all learning to an online format and did not proportionately reimbursed or reduced tuition and fees. Defendant required the same money payment from Plaintiffs and the Class as originally agreed upon but reneged upon its commitment to provide to Plaintiffs and the Class the benefit of their bargain.

162.     Plaintiffs and members of the Class have suffered damages as a direct and proximate result of Defendant's breach, including but not limited to being deprived of the on-campus education, experience, and services to which they were promised and for which they forwent alternative work and educational experiences.

163.     As a direct and proximate result of Defendant's breach, Plaintiffs and the Class are entitled to damages to be decided by the trier of fact in this action. Such damages include, but are not limited to, the reimbursement of certain tuition, fees, and other expenses that Defendant collected but did not deliver. Defendant should provide a significant reimbursement for the tuition and fees Plaintiffs and Class Members paid for the Spring 2020 Term.

164.     Defendant's performance under the contract is not excused due to COVID-19. Indeed, there is no plausible excuse for Defendant to retain and continue to charge full tuition and

46

fees when it did not provide—and has no plans to provide—the promised educational services. Even if performance was excused or impossible, Defendant would nevertheless be required to reimburse the funds it charged for services it did not provide in the Spring 2020 Term.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered against the Defendant and that the Court grant the following:

a) An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are Class Representatives, that Plaintiffs' attorneys shall be appointed as Class Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that Class notice be promptly issued;

b) Judgment against Defendant for Plaintiffs' and Class Members' asserted claims for relief;

c) For compensatory and punitive damages in amounts to be determined by the Court and jury;

d) For prejudgment interest on all amounts awarded;

e) For an order of restitution and all other forms of equitable monetary relief;

f) For an injunctive relief as pleaded or as the Court may deem proper; and

g) For an order awarding Plaintiffs and the Class their reasonable attorney's fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand trial by jury on their own behalf and on behalf of Class Members.

Dated: March 7, 2022

Respectfully submitted,

By:  _/s/ Daniel J. Kurowski_

Kristie LaSalle (BBO #692891)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
T: (617) 482-3700
kristiel@hbsslaw.com
Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
T: (206) 623-7292
steve@hbsslaw.com

Daniel J. Kurowski (*Pro Hac Vice*)
Whitney K. Siehl (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
T: (708) 628-4949
dank@hbsslaw.com
whitneys@hbsslaw.com

Warren T. Burns (*Pro Hac Vice* forthcoming)
LeElle Slifer (*Pro Hac Vice* forthcoming)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
T: (469) 904-4550
F: (469) 444-5002
wburns@burnscharest.com
lslifer@burnscharest.com

David Pastor (BBO # 391000)
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue 3rd Floor
Boston, MA 02110
T: 617-742-9700
F: 617-742-9701
Dpastor@pastorlawoffice.Com

Alec M. Leslie (*Pro Hac Vice*)
BURSOR & FISHER, P.A.
888 Seventh Avenue

48

New York, NY 10019
T: 646-837-7126
F: 212-989-9163
Aleslie@bursor.com

Frederick J. Klorczyk , III (*Pro Hac Vice*)
BURSOR & FISHER, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
T: (925) 300-4455
F: (925) 407-2700
Fklorczyk@bursor.Com

*Attorneys for Plaintiffs, individually and on behalf of all others similarly situated*

## CERTIFICATE OF SERVICE

I, Daniel J. Kurowski, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: March 7, 2022                     */s/ Daniel J. Kurowski*